IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2022

**STATE OF TENNESSEE v. TERESA SUMPTER**

**Appeal from the Criminal Court for Shelby County**
**No. C1902662      James M. Lammey, Judge**
——————————————————

**No. W2021-00119-CCA-R3-CD**
——————————————————

A Shelby County jury convicted the defendant, Teresa Sumpter, for the Class A felony of theft of property valued over $250,000 and for the Class B felony of money laundering. The trial court imposed an effective sentence of sixty years to be served in the Tennessee Department of Correction and ordered the defendant pay $373,412.77 in restitution. The defendant filed this timely appeal, challenging the evidence supporting her theft conviction and the trial court's ruling allowing the defendant's prior theft convictions to be entered into evidence. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Ramon Damas, Memphis, Tennessee, for the appellant, Teresa Sumpter.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Byron Winsett and Dennis Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural History*

A Shelby County grand jury indicted the defendant, Teresa Sumpter, for theft of property valued over $250,000 and money laundering. Tenn. Code Ann. §§ 39-14-103; -903. Prior to trial, the State filed a motion to admit evidence of the defendant's two prior theft convictions under Rule 404(b) of the Tennessee Rules of Evidence. In the motion, the State argued the evidence was admissible for the purpose of "filling a conceptual void,

establishing the [d]efendant's intent, and establishing that in defrauding [the victim], the [d]efendant engaged in one common scheme, purpose, intent, or enterprise." At the outset of trial, the trial court conducted a hearing outside the presence of the jury and determined that the evidence of the defendant's prior convictions was not admissible under Rule 404(b). The State then proceeded with its case-in-chief.

However, before the victim testified, the State renewed its Rule 404(b) motion, arguing "the defense intends to take advantage of the conceptual void created by the lack of the criminal history before the jury," by attacking the victim's competence. As a result, the State asserted: "The crucial moment regarding competence in this situation again is the moment of hiring, where the defendant s[o]wed the deceit necessary to get her foot in the door. She would not have been hired had she indicated, as she should in this context, that she had a criminal history." Upon reconsideration, the trial court ruled that the evidence of the defendant's criminal history was admissible under Rule 404(b) in order to show the defendant's intent to deceive the victim. The evidence produced at trial is summarized below.

The crimes at issue stem from the two-year, employment relationship between the defendant and the victim, Jerry Schatz. The relationship began in July 2013 when the victim, a solo law practitioner, hired the defendant to work as his administrative assistant in his law office in Shelby County, Tennessee. Prior to hiring the defendant, the victim placed an ad on Craigslist for the position with the help of Brad Henderson, his interim legal assistant. The defendant applied, and the victim interviewed her. As part of the hiring process, the victim called two business references provided by the defendant, both of which "checked out." The victim also explained that his "policy and practice for many years has been to ask an applicant[,] [']have you ever been convicted of any kind of criminal matter[?']" Though the victim did not specifically recall asking the defendant about her criminal history, he stated the defendant did not indicate that she had been previously convicted of any crimes. The victim explained, however, that after the discovery of the crimes at issue, he learned the defendant had twice been convicted of felony theft. Had the victim known of the defendant's criminal past, he "absolutely would not have hired her."

Regardless, the victim hired the defendant, and she became his administrative assistant and helped "run the office." The two agreed on an annual salary of $30,000 and general hours of 8:30 a.m. to 5:00 p.m. The victim stated he "never" asked the defendant to work on Saturday or Sunday, noting he did not work on Saturday for religious reasons. The victim paid the defendant by check from his business operating account. At first, the victim wrote out the checks, but "[a]fter a short time I've always had the legal assistant write out the check and I would sign it." The victim stated he was the only authorized signatory on his business operating account, the account on which paychecks were drawn.

In relation to his practice, the victim also maintained a credit card for business expenses and an IOLTA[1] trust account.

The victim described himself as "[t]echnologically impaired," noting he did not know how to use the internet in 2013 and his only computer was kept in his office for his assistant's use. However, during the course of the defendant's employment, she convinced the victim to pay for some of his business expenses "through the computer." The victim stated he was not involved in setting up any online accounts, in paying bills online, or in reviewing the online payments made by the defendant from his business operating account. Rather, the defendant would notify the victim when monthly statements arrived and generally provide the total expenditures for the month. According to the victim, the defendant always indicated amounts within a normal range for his office expenditures, between $200 to $500. The victim regularly asked the defendant if his accounts were balanced, and she always indicated they were balanced "to the penny." The victim noted that when he did ask to review a bank statement, the defendant would not provide them to him immediately, stating instead that she was either working on them with Renee Landry, one of the victim's CPAs, or that she had taken them home with her because she could not complete all of her work at the office. The victim stated "[T]here was always some reason why [the bank statements] weren't available."

Mary Liz Arwood provided monthly bookkeeping services to the victim beginning in 2011 for his business operating and IOLTA trust accounts. After the defendant began working for the victim, Ms. Arwood started working, at the defendant's suggestion, on Saturdays instead of during the week to balance the victim's business operating account. Ms. Arwood no longer received the checkbook for the victim's IOLTA trust account. When she asked the defendant for the IOLTA trust checkbook, the defendant provided the checkbook for the victim's personal account. Ms. Arwood returned the personal account checkbook and did not ask for the IOLTA trust account checkbook again. Ms. Arwood continued trying to balance the business operating account but stated that "[i]t got messy" and became "hard to account for the amounts written down." When Ms. Arwood asked the defendant about the change in the checkbook, the defendant explained "that she was having to do more and more of [the victim's] personal day-to-day management as far as paying his personal bills, paying whatever he needed to pay because he was becoming less and less capable of doing it for himself, like light bills, his home, whatever personal bills he had." Ms. Arwood stated that "[t]here was stuff written down to accommodate the charges on the bank statement" but it "was hard to tell what was going on" in the business. According to the victim, Ms. Arwood never indicated that there were any issues with the business operating or IOLTA trust accounts.

---

[1] Interest on Lawyers' Trust Account.

During her employment, the defendant also began compiling raw figures to provide to the victim's CPAs, Joseph Banker and Ms. Landry, for the preparation of his tax returns. The defendant offered to do this in an effort to save the victim money. Mr. Banker testified that he Ms. Landry performed accounting work for the victim based upon information presented to his firm by the defendant. Mr. Banker reviewed spreadsheets provided to his firm by the defendant which were entered into evidence.

The victim then detailed how he uncovered the defendant's theft. On September 21, 2015, the victim received a phone call from a neighbor who had received several pieces of his mail, including a monthly bank statement for a money market account he held with Ally Bank. In reviewing the statement, the victim saw a balance of approximately $600. The victim realized he had not seen a statement for this account in "a long time" but noted he did not use the account "on any kind of regular basis." Regardless, the last statement he recalled indicated a balance of approximately $150,000. The victim, believing the statement was in error, called Ally Bank to report the error. In doing so, a representative informed the victim that the balance on the statement was correct, noting "there's been a number of large transactions just recently." The victim stated he had not used the account recently and had not made any large transactions. The representative then told the victim that his account had been "compromised."

The next morning, the victim went to Independent Bank to assess the status of his other bank accounts. A bank representative pulled statements for the victim's personal account, business operating account, and IOLTA trust account. The victim did not notice anything unusual in the statements for his personal bank account. However, the victim was "horrified" as he reviewed statements for his business operating and IOLTA trust accounts. More specifically, the victim stated, "The operating account I have always kept somewhere between about 6 and 10,000 [dollars] when I was actively practicing. And it was showing I think a few hundred dollars. And the IOLTA account, the trust account was showing something like 70 cents." The victim saw "all these checks that had been written on these accounts," knowing he did not draft the checks. Further, the victim explained the checks "were in large amounts and I knew there wasn't that much money. At least I had no reason to believe there was that much money in the trust account." The bank representative then showed the victim the deposits made into the trust account from Ally Bank, deposits the victim did not make. In reviewing the bank statements for the business operating account, the victim saw "numerous inappropriate checks," including "the most outstanding thing was all of these checks made payable to her, [the defendant], that I recognize as not my handwriting and that had been forged." The victim explained "the more we got into it, the more I realized the extent of this, the size of this, and I was just dumbfounded I think is the best word. I was dumbfounded. It was surreal. That's the best way I can describe it. It was absolutely surreal." The victim explained that while he was at the bank, the defendant was calling him incessantly. The victim avoided the defendant's calls as he went to the

- 4 -

police and had the locks changed at his office and stated he has not spoken to the defendant since September 22, 2015.

Traci Dyer, the property manager for the victim's office building, explained that on September 22, 2015, she received a phone call from a man impersonating the victim. Ms. Dyer knew she was not speaking with the victim because she had spoken with the victim many times before and "[knew] his voice very well." After receiving this phone call, Ms. Dyer called the victim's office "to alert the office that something funny was going on." The defendant answered, and while Ms. Dyer was speaking with the defendant, the victim called the management office and asked to speak with Ms. Dyer. Ms. Dyer attempted to get off the phone with the defendant without alerting her to anything and then spoke to the victim who was "very panicked." The victim stated the defendant "had been escorted off the property, that she had stolen a lot of his money and that he needed the locks changed immediately." Ms. Dyer had the locks changed that afternoon. They also realized the defendant had the victim's office phone line transferred to her cell phone.

Over the course of the next year, the victim continued learning about the defendant's crimes. The victim provided extensive testimony regarding the numerous ways the defendant committed her crimes, including drafting fraudulent checks on his business operating and IOLTA trust accounts, making unauthorized charges on his credit card and PayPal accounts, opening numerous credit cards in his name, and altering his bank statements to conceal her theft. To support the testimony presented, the State provided significant documentation which included the victim's bank statements, receipts, cashier's checks, forged and fraudulent checks, deposit slips, W-2 forms, tax documentation, the defendant's bank statement, credit card application forms, portions of the check registrar for the victim's business operating account, a spreadsheet created by the defendant that did not accurately reflect the office expenses for the 2014 year, altered bank statements, and a document prepared by Vonda Gustaffson at Independent Bank indicating the defendant took funds from the victim totaling $362,248.73 based upon the bank's own documentation and items provided by the victim. The victim, along with numerous other witnesses, identified the documents and provided detail explaining how the documents related to the defendant's crimes.

The victim obtained some of the documents in March 2016, after meeting with the defendant's ex-husband, Jeffrey Savarin. During the meeting, Mr. Savarin provided numerous documents to the victim that he had found in the defendant's home. While the defendant was in jail, she asked Mr. Savarin to go to her house and move her belongings to a storage unit. In doing so, Mr. Savarin "found a satchel that had a lot of various documents" that had the victim's name on them. Mr. Savarin provided the satchel and the documents to the victim which included various tax returns, receipts, a $25,000 cashier's check, bank account statements, and credit card statements. Mr. Savarin identified one

document that struck him "as being very odd." The document had the victim's name on it, had white out on it, and "[y]ou can see where . . . there's been strips of paper cut detailed, put on this page, taped." Similarly, the victim identified a statement for his Citi Card account which was the account the victim used for his business expenses. After reviewing this statement, the victim explained "it was pretty clear at least some of the things that had been going on, that she had taken documents and altered them and given me the altered document."

The victim eventually realized he was missing numerous bank statements for his various accounts from his desk. In place of the missing bank statements, the victim found numerous altered statements, and he began comparing the original bank statements to the ones provided to him by the defendant. The victim explained his normal charges were usually between $250 and $600 per month. However, the original bank statements showed charges between $2,500 and $3,000 per month. The victim stated:

> I've never had anything like that on my office account ever. And it's got three and four and sometimes five pages of transactions, whereas the one I'm looking at in my desk drawer that was the altered copy would have the normal five, six, seven, eight charges a month with the correct amount, you know, say total charges of three or [four], [five] [hundred] dollars showing no balance because I always paid my credit cards and always have, whether business, personal, or anything. I've always paid them off at the end of the month, always. I've never had a balance.

The victim identified a copy of his standard employment letter dated at the time the defendant began working for him. However, the victim stated the letter was not complete nor was it signed by the defendant which was his standard practice. The victim also later learned from various clients that the defendant forwarded the office telephone line to her cell phone. The victim asked the defendant to stop so clients could leave messages on the office answering machine. The defendant told the victim that she would return all of the calls, but the victim insisted she stop. According to the victim, however, the defendant continued to forward the phone lines to her cell phone "off and on" for a majority of her employment. The victim explained the defendant also handled the mail in the office, noting he occasionally found the defendant looking out the office window for the mailman. The victim asked why she was waiting, and the defendant responded that she "just like[d] to get the mail, you know, as soon as he brings it." If the victim asked about the mail, the defendant responded that she could take care of whatever had been delivered.

Regarding her theft, the victim stated the defendant spent money on "[j]ust about any kind of category of expense you could think of," including, rent payments on two different residences, internet payments, telephone payments, utility payments, Merry

Maids services, pest control services, day-to-day living expenses, car payments, car insurance, life insurance premiums, car repair payments, Target purchases, restaurant expenses, "thousands of dollars for bar bills," limousine services, moving expenses, jewelry, clothing, entertainment expenses, airline tickets, resort hotel expenses, boat charters, concert tickets, art work, collectibles, Amazon charges, a French bulldog, veterinarian bills, pet boarding services, and "just a myriad of miscellaneous type expenses." The defendant also purchased numerous vehicles during the course of her employment with the victim including, a Mercedes, a BMW, a motorcycle, a Corvette, and a truck. The victim explained that he learned his friend, Sue McMahon, loaned the defendant $25,000 via a cashier's check that the defendant deposited into the victim's IOLTA trust account. The defendant then used the $25,000 to aid in her purchase of the BMW.

Regarding the cashier's check, Ms. McMahon testified the defendant told her that she was indebted to the IRS for $25,000 and "she was really trying to figure out how to get the money." The defendant further claimed the victim planned to loan her the money but instead had to use the money for his children. The defendant stated she had borrowed money from the victim in the past and drawn up a promissory note for the loans and paid the victim back over time. Ms. McMahon explained that she "felt really bad" for the defendant, so she agreed to loan the defendant $25,000. Ms. McMahon obtained a cashier's check for $25,000 and gave it to the defendant. An attorney notarized the promissory note which stated the defendant would pay Ms. McMahon "$1200 a month over two years and at the end of the two years she'd pay the remainder." The defendant made two payments on the note but the remainder of the loan is still outstanding. A copy of the cashier's check was entered into evidence.

The victim also stated the defendant had lunch delivered to the office almost every day through the Meals in Motion service. Upon the victim's review of his credit card statements, he discovered the defendant's lunches averaged between $22 and $25 per day, totaling $4,800. The victim also learned the defendant used her mother's maiden name, Tapp, in filling out at least one of the fraudulent credit card applications and discovered numerous charges on his credit cards for vacations in Tybee Island, Georgia. The related charges included airline tickets, accommodations, food, and a chartered fishing boat. Logan Mashburn accompanied the defendant on a vacation to Tybee Island, noting she paid for his airplane ticket and lodging for the trip. In addition, Mr. Mashburn stated the defendant also bought him a Rolex and drinks at the bar.

The defendant also forged numerous checks from the business operating account. The defendant forged checks in several different ways, including by making the checks payable to herself but failing to include what the checks were for in the registrar, the memo line, or both. The victim agreed that the defendant sometimes recorded authorized

payments, sometimes recorded unauthorized payments, sometimes failed to record the payment in the registrar at all, and sometimes incorrectly noted what the check was for in the registrar. The victim reviewed all of the checks drawn from the business operating account to the defendant and determined which were fraudulent and which were authorized. If the victim was unsure about a transaction, he did not include it in his calculation for determining the amounts stolen by the defendant. After reviewing the pertinent documents and records relating to the business operating account, the victim compiled a list of both authorized and unauthorized checks written out to the defendant from July 2013 through September 2015, this list was entered into evidence. In calculating the amount of the theft from the business operating account, the victim did not include the legitimate wages earned by the defendant during her employment, even if he determined the check had been forged by the defendant.

After discovering the larger theft, the victim learned about two additional Citi Card accounts the defendant opened in his name that listed the defendant and Gavin Sumpter, the defendant's husband, as authorized users. The victim explained the defendant took funds from his business operating account to pay the balances on the credit cards. Ultimately, the victim determined the defendant made unauthorized payments totaling $77,954.22 to Citi Card over her two-year employment.

The victim also learned of fraudulent Chase and American Express credit cards opened by the defendant in the victim's name. The victim learned about the American Express credit card when he was served with a lawsuit by the company. The lawsuit against the victim was ultimately dismissed, and he was reimbursed for approximately $13,000 for purchases made by the defendant on the fraudulent credit card. The victim identified some of the charges made to the American Express credit card which included service expenses to Wolfchase Honda, purchases at Pier One and Game Stop, and bar bills. The victim reviewed all of the payments made to the Chase credit card from his business operating account and compiled a list of fraudulent payments which totaled $34,944.64. The victim stated he did not authorize the defendant to use his credit cards for anything other than office supplies on the legitimate Citi Card account.

The victim also identified unauthorized transactions from his bank accounts to PayPal. A list indicating fraudulent charges to PayPal totaling $27,503.50 was entered into evidence. The charges included payments to Progressive Insurance, Southwest Airlines, StubHub, Ticket City, Tiffany's, and Stromburg Time. The victim denied authorizing any of the above-listed purchases.

The victim also compiled a list detailing the four vehicles the defendant purchased through fraudulent checks drawn on his IOLTA trust account between August 2013 and July 2015. In order to complete the transactions, the defendant "forged checks on the Ally

account, transferred it into the IOLTA or trust account and then cut the check from the IOLTA account." Within the first month of her employment, the defendant purchased a 2002 Mercedes for $11,475. The defendant also purchased vehicles from Bumpus Harley Davidson, Roadshow BMW, and Jimmy Gray Chevrolet. The defendant forged checks on August 20, 2013, May 8, 2015, June 19, 2015, July 7, 2015, and July 10, 2015. The victim noted two of the checks went to Jimmy Gray Chevrolet for the purchase of a Corvette for $87,482.98. In total, the defendant took $137,957.98 from the victim in order to purchase the four vehicles.

The victim identified several additional lists he created which documented fraudulent charges, checks, or payments made by the defendant with his accounts. The lists showed: checks totaling $16,789.08 to Xuan Liu between August 2013 and September 2015 for rent payments; "e-debits" totaling $13,549.35 made to "Reed & Associate" between January 2015 and September 2015 for rent payments for the defendant's rented home in Bartlett; "e-debits" totaling $13,113.64 to the American Express credit card; checks totaling $7,590 to Neighborhood Title Loan; monthly "e-debits" totaling $5,929.82 to Life Insurance Southwest; monthly "e-debits" totaling $478.48 to Mountain Laurel Association Insurance; and "e-debits" totaling $200 to Conn Appliances. The victim explained all of these payments were reflected as debits from his bank accounts, and he did not authorize any of them.

Ultimately, the victim created a list summarizing all of the theft he uncovered after reviewing his bank statements and any related documentation and noted the theft totaled $373,412.77. The following is a recreation of the victim's final list:

| Description | Amount | Running Total |
|---|---|---|
| Trust Checks Used to Buy Vehicles | $137,957.98 | $137,957.98 |
| Payments to Citi Card (less authorized spending) | $77,954.22 | $215,912.20 |
| Payments to [the defendant] by Check (Fraudulent "salary") | $64,905.56 | $280,817.76 |
| Payments to Chase Credit Card | $34,944.64 | $315,762.40 |
| Payments to Xian Liu | $16,789.08 | $332,551.48 |
| Payments to Reed & Associates | $13,549.35 | $346,100.83 |

- 9 -

| | | |
|---|---|---|
| Payments to American Express | $13,113.64 | $359,214.47 |
| Payments to Neighborhood Title Loans | $7,590.00 | $366,804.47 |
| Payments to Life Insurance Company of the Southwest | $5,929.82 | $372,734.29 |
| Payments to Mountain Laurel Insurance | $478.48 | $373,212.77 |
| Payments to Conn Appliances | $200.00 | **$373,412.77** |

Finally, the victim detailed the defendant's behavior after September 22, 2015. The defendant traded the Corvette for a Silverado truck and received a $35,000 check from Serra Chevrolet for the difference in the price of the two vehicles. The defendant also sent the victim emails and a letter in an effort "to make it look like [] she voluntarily left because of an emergency health problem that came up with her son and apologizing for having to resign" and "thanking [the victim] for letting her work." The victim read portions of the correspondence into the record. In one section of the letter, the defendant stated:

> I am also aware of the financial obligations that I have to you that remain outside of our professional relationship. I am in the process of compiling those figures into one document and hopefully will have that to you in the next day or so. I have sale of several assets that are pending within the week which should settle us up. I certainly will not walk away without filling those as generous as you have been to date.

In the emails, the defendant stated she owed the victim approximately $145,000, which was adjusted in a later email to $175,000, but the victim denied any such financial obligations, stated he was not aware of any financial obligations, and indicated he never received any "figures" from the defendant. In the initial email, the defendant also stated she would be mailing the victim "a proposal, which will resolve any outstanding matters between us in full." The victim did not receive such a proposal. In the later email, the defendant stated she "overlooked some obligations which caused the figure to be larger than originally calculated. I made those corrections and adjusted everything accordingly." The victim did not respond to any of the defendant's correspondence.

Additionally, the defendant sent the victim purported promissory notes dated March 1, 2014, July 1, 2015, and October 1, 2015, for sums of $65,000, $23,000, and $18,000. The victim denied the legitimacy of the notes, stating the terms of the notes were

"laughable" because they were "tied into credit card accounts and give her the right to charge whatever she wants on credit cards and that's part of the principle amount that she's being loaned." The victim denied lending the defendant the amounts listed in the notes, but admitted he agreed to loan the defendant $1000 when she began her employment because she was having a hard time financially. This loan was payed back over time through the defendant's paychecks. After reviewing all of the pertinent documents and records, the victim calculated the total amount taken by the defendant to be $373,412.77.

During cross-examination, the victim admitted it was his duty under the Rules of Professional Responsibility to safeguard the IOLTA trust account and client funds, review the monthly statements for the trust account, and ensure the account was balanced. The victim also admitted that if he had reviewed his bank records "on a regular basis, I certainly would have expected to find out what was going on earlier than I did." The victim stated he looked at his bank statements "from time to time," but he "did not look at it every month" and did not review the statements "carefully." The victim stated, "[i]f I had not trusted [the defendant], I wouldn't have hired her."

The State presented testimony from several individuals who interacted with the defendant as she carried out her crimes against the victim. Representatives from Jimmy Gray Chevrolet, Roadshow BMW, Serra Chevrolet, Victory Auto Sales, and Bumpus Harley Davidson each testified regarding the details of the transactions they engaged in with the defendant as she purchased different vehicles.

Michael Lipscomb of Victory Auto Sales sold the defendant a "2002 Mercedes CLK430 two-door convertible" after receiving "a check from her employer." The defendant explained to Mr. Lipscomb that her employer "was helping her get the car." A copy of the check, dated August 20, 2013, and labeled from the account, "Tennessee Bar Foundation, IOLTA, Jerry A. Schatz Atty Trust," for $11,475 was entered into evidence. Mr. Lipscomb verified the check through Telecheck and also called the law firm of Jerry Schatz. According to Mr. Lipscomb, a man answered the phone, identified himself as Jerry Schatz, and confirmed he was lending the defendant the money for the Mercedes. The bill of sale, along with other related documents for the Mercedes purchase, were entered into evidence. Stanley Blount of Roadshow BMW sold the defendant a 2015 X4 crossover BMW. The defendant purchased the vehicle in part "through a check that was owed to her from her employer and that she would finance the rest of it." Mr. Blount identified a W-2 form provided by the defendant which indicated her income was $76,333.22. Documentation of the transaction, including a $25,000 check "from Jerry Schatz's trust account," was entered into evidence. Kristi Smith, the finance manager for Bumpus Harley Davidson, testified regarding the defendant's purchase of a motorcycle for $22,171.17 in the summer of 2015. Ms. Smith stated the defendant purchased the motorcycle via check

and credit card, noting the check was in the amount of $14,000. Documents relating to the sale of the motorcycle were entered into evidence.

James Colson of Jimmy Gray Chevrolet sold the defendant the Z06 Corvette after receiving an email offer from the defendant from the email address, "JAS@jerryschatz.com." The dealership ultimately agreed to sell the Corvette to the defendant for $84,395, and the defendant explained she would pay for the Corvette with money "out of her trust fund." The defendant paid for the Corvette with two separate checks, the first check was for $40,000 on July 7, 2015, and the second check was for $47,482.98 on July 10, 2015. The contract, copies of the checks, and additional related documents for the sale of the Corvette were entered into evidence. Charles Pollock of Serra Chevrolet helped the defendant trade the Corvette for a Silverado pickup truck. Mr. Pollock stated that after taxes were paid and the vehicles were traded, Serra Chevrolet wrote a check to Mr. Sumpter[2] on September 30, 2015, for $35,415.27, the difference in price between the vehicles. Photographs of the Corvette and the Silverado truck were entered into evidence. Documents related to the trade-in transaction, including the bill of sale, were also entered into evidence.

Oleavia Lucas testified regarding loans the defendant took out from Neighborhood Title Loans between 2013 and 2015. Ms. Lucas identified a $2,000 title loan taken out by the defendant on October 12, 2013, on a 2002 Mercedes. Ms. Lucas noted the defendant paid the loan with checks from her employer that "were already filled out." Documentation of the loans were entered into evidence.

Lee Bowling, owner of the pet waste removal service, On Doody, stated he provided services to the defendant at her home in Bartlett between 2013 and 2015. Mr. Bowling stated the defendant paid for the services via credit card. After the defendant's crimes were uncovered, the victim called Mr. Bowling, explained the situation to him, and asked if he would return approximately $800 that had been charged to his credit card for the services. Mr. Bowling agreed to do so because he "wanted to do the right thing."

Ben Reed, of the property management company, Reed & Associates, testified that his company rented a home to the Sumpters for $1,795 per month in Bartlett, Tennessee, on December 15, 2014. The Sumpters applied for the home online and provided copies of their bank statements from Independent Bank which indicated the defendant received a monthly salary of $5,750. The records in relation to the rental of the home were entered into evidence.

---

[2] Mr. Pollock stated because the manufacturer statement of origin for the Corvette was in Mr. Sumpter's name, Serra Chevrolet titled the Silverado pickup truck in Mr. Sumpter's name.

Finally, Larry Diamond testified regarding his relationship with the victim. Mr. Diamond shared an office with the victim at the time of the crimes at issue. He recalled being locked out of the office one morning, and, when he spoke to the victim, the victim was upset and explained what he uncovered about the defendant's deceit.

The State then rested its case-in-chief, and the defendant testified on her own behalf. The defendant admitted she was previously convicted of theft on March 17, 2003, and September 13, 2006. The defendant stated that while interviewing for a position with the victim, the victim told her that "it was an all-encompassing position" and that she would be "responsible not only for the typing and the filing and things of that nature, but there would be additional things like light bookkeeping, . . . client billing, printing out the bills for the client at the end of the month and things of that nature." The defendant took the position with the victim and noted the victim agreed to pay her weekly at first so that she could "start earning money immediately to meet [her] obligations." The defendant explained that she and the victim agreed to additional compensation for her performance of other tasks outside of the typical office work. For this work, the defendant believed she "would be compensated in another way, by another [] form of payment. And at that time I didn't know if it would be cash or check." Ultimately, the defendant stated she was paid for this work by check. Regarding the Mercedes she purchased in the summer of 2013, the defendant stated she could not afford the vehicle on her salary, so she "informed [the victim] of the situation and asked if it would be possible for me to borrow money to purchase this vehicle." The defendant explained the victim had a business credit card to be used "for supplies and things of that nature" which she also began using because she did not have a "major credit card" of her own at the time. The defendant stated she was in "a rebuilding process" and did not have access to a credit card. As a result, she began using the victim's credit card for personal online purchases and payments. The defendant claimed she "would mark what was mine and what was his."

The defendant also explained that, while working for the victim, her husband was ill and went through periods of severe depression. Regarding the altered statement entered into evidence in Exhibit 1, the defendant stated she did "not have a recollection of this document" and stated she did not alter it.

The defendant detailed what happened on September 22, 2015, from her perspective. She stated that, at the time, her son was suffering from "some really bad and strange health problems" and that she had scheduled a doctor's appointment for him that day around 11:45 or 12:15. She informed the victim she would need to leave early in order to take her son to the appointment. The victim, however, did not arrive to work as scheduled. The defendant began calling the victim repeatedly because she wanted him to come to work so she could leave. When the victim arrived "much later than usual," the defendant "was angry, like really angry." She "voiced [her] discontent," and the victim

left again. When the victim returned, the defendant again informed the victim that she was angry. The two worked "on a great big discovery project" before the victim left for lunch. This again angered the defendant because she knew she would not be able to make her son's doctor's appointment as a result. The defendant began yelling, acting "very inappropriate" and "extremely terrible." She stated she was "done" as she believed her relationship with the victim "had eroded." The defendant explained she was indebted to the victim, and it placed stress on their relationship. The defendant, however, denied ever using the victim's credit cards, checks, or other financial tools without the victim's knowledge.

During cross-examination, the defendant denied using the victim's credit card to purchase appliances from Conn Appliances but stated she made a payment to Conn Appliances for furniture. She, however, admitted to using the victim's accounts to make payments to Mountain Laurel Insurance, Life Insurance Company of the Southwest, Neighborhood Title Loans, American Express totaling $13,113.64, Reed & Associates for her home totaling $13,549.35, Xaun Liu totaling $16,789.08, and Chase Credit Card for $34,944.64. Regarding the Chase Credit Card, the defendant stated that she participated in opening that card and that "[i]t was agreed" to use her mother's maiden name to open the card. The defendant admitted to being the primary user for the American Express credit card at issue. The defendant stated her yearly salary was $30,000, but the evidence showed she received $126,214.16 in checks from the victim. The defendant admitted to purchasing the Corvette and trading it in for the Silverado truck. She admitted to purchasing the BMW from Roadshow BMW and using money from the victim's firm to make the down payment. She reviewed the 2014 W-2 form she provided to Roadshow BMW and confirmed the document. The defendant admitted she paid for the Mercedes with funds from the victim's IOLTA trust account about one month after she started working for the victim. The defendant, however, denied writing a check from the account. She stated that, at the time she bought the Mercedes, she was in "some debt" and "basically just had no money."

She admitted to trading the Corvette for the truck on September 29, 2015, about a week after her employment with the victim ended. For the trade-in, she received a $35,000 check. The defendant stated her family spent the $35,000 while she was in jail. She agreed the $35,000 belonged to the victim but claimed the police advised her not to give the victim the money. The defendant admitted she went to Tybee Island with her husband, Mr. Mashburn, and Jason Coskey using the victim's money, which included the men renting a deep-sea fishing boat. The defendant admitted to using the credit cards at issue to pay for purchases at Doc Watson, Apple iTunes, Kroger, Natalie's Liquor Warehouse, and Hollywood Feed. She also admitted to purchasing a French bulldog with the victim's money. The defendant did not dispute the victim's calculation of $77,000 in credit card charges that were attributable to her. The defendant admitted to altering the victim's bank statement to reflect her name on the statement and to creating a fake bank statement for her

husband both of which she provided to Reed & Associates to support their income upon renting their house. The defendant explained Reed & Associates "required [a bank statement] for [Mr. Sumpter] and he didn't have a bank account," so as a result, she made one up for him. She also agreed that her spending and use of the victim's money totaled $373,412.77 in addition to her salary. The defendant stated that money was put into the victim's Ally savings account for the purpose of purchasing the numerous vehicles at issue. The defendant acknowledged her October 1, 2015 bank statement from First Tennessee reflected a deposit of $35,415.27, the proceeds from the trade-in of the Corvette and truck.

The defendant admitted she forwarded the office phone to her cell phone on September 22, 2015, and that she regularly forwarded the phone to her cell phone. The defense then rested.

After its deliberations, the jury convicted the defendant of theft of property valued over $250,000 and money laundering. The defendant, however, did not return to the courtroom for the verdict, and the trial court revoked her bond as a result. After a hearing, the trial court imposed an effective sentence of 60 years to be served in the Tennessee Department of Correction. The defendant filed a motion for a new trial which was denied by the trial court. This timely appeal followed.

### *Analysis*

I.  Sufficiency of the Evidence

The defendant argues the evidence is insufficient to support her theft conviction,[3] suggesting the record demonstrates the victim consented "to the taking either by knowing about it or loaning the amount to [the defendant]." The State disagrees.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623

---

[3] The defendant does not challenge her conviction for money laundering on appeal, and, as a result, we decline to review the same.

- 15 -

(Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). "Our supreme court has noted that although the statute defining theft does not contain 'an element regarding the value of the property stolen,' the property's value should be included in the indictment, and its value

- 16 -

'must be determined in order to establish the grade of the theft offense.'" *State v. Moats*, No. E2019-02244-CCA-R3-CD, 2020 WL 6392483, at *3 (Tenn. Crim. App. Nov. 2, 2020) (quoting *State v. Jones*, 589 S.W.3d 747, 756 (Tenn. 2019) (internal citations omitted)), *perm. app. denied* (Tenn. Mar. 17, 2021). "Whenever a determination of value is necessary to assess the class of an offense in this code or the level of punishment, the determination of value shall be made by the trier of fact beyond a reasonable doubt." Tenn. Code Ann. § 39-11-115. Theft of property valued at $250,000 or more is a Class A felony. Tenn. Code Ann. § 39-14-105(a)(6).

Here, the indictment alleged the defendant stole over $250,000 from the victim. At trial, the State presented proof showing the victim and the defendant entered into an employment agreement in July 2013, and the victim agreed to pay the defendant a yearly salary of $30,000. However, over the course of the two-year relationship, the defendant took $373,412.77 from the victim through her unauthorized use of the victim's credit cards, her use of credit cards opened in the victim's name without his consent, and her drafting of checks from the victim's business operating and IOLTA trust accounts. At trial, the victim identified voluminous bank records and documentation demonstrating the defendant's theft, and the defendant did not dispute the amount of the taking. Rather, the defendant argued, both at trial and on appeal, that the victim consented and knew of her use of his funds. The record, however, does not support this contention.

Instead, the record indicates the victim learned of the defendant's theft after a bank statement was mis-delivered to his neighbor's home on September 21, 2015. When he opened the bank statement, he saw a balance of approximately $600 for an account that he believed to contain approximately $150,000. He called the bank and discovered the account had been compromised. The following day, the victim went to Independent Bank to check his remaining accounts, and discovered his business operating and IOLTA trust accounts had also been compromised. The victim then engaged in an extensive review of his accounts and determined not only had the defendant taken funds from his existing accounts, but also she had opened several credit cards in his name which she used to fund her lifestyle. The victim totaled all of the defendant's expenditures and determined she took $373,412.77 from him. At trial, the defendant did not dispute this amount and admitted to using the victim's funds.

From these facts, a rational trier of fact could have found the defendant guilty of theft of property valued over $250,000 because the record makes clear the defendant intended to deprive the victim of the funds without his consent and exercised control over the same. As noted, the defendant admitted to taking the victim's money and to using credit cards in the victim's name for her rent, personal items, vehicles, insurance payments, and personal loan payments. The State provided testimony from numerous people who unknowingly participated in the defendant's theft, including those who sold her vehicles

and provided services to her between 2013 and 2015. Though the defendant suggests the victim consented to the taking, the jury, as the trier of fact, is entrusted with determining the value of the theft, the weight of the evidence, and evaluating the credibility of witnesses, and, based on the verdict, the jury reconciled the conflicting proof in favor of the State. Tenn. Code Ann. § 39-11-115; *Campbell*, 245 S.W.3d at 335; *Dorantes*, 331 S.W.3d at 379. This Court will not reweigh the evidence. *Dorantes*, 331 S.W.3d at 379. Accordingly, the evidence was sufficient for a jury to convict the defendant of theft of property valued over $250,000, and the defendant is not entitled to relief.

II.    404(b) Ruling

The defendant asserts the trial court erred in admitting evidence of her two, prior theft convictions in violation of Tennessee Rule of Evidence 404(b). The State asserts the trial court properly admitted the evidence of the defendant's convictions pursuant to Rule 404(b) in order to show the defendant's intent. Upon our review, we agree with the State.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice is defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (internal quotation omitted). Further, "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted); *see also State v. Jeffrey Wooten*, No. E2018-01338-CCA-R3-CD, 2020 WL 211543, at *8 (Tenn. Crim. App. Jan. 13, 2020), *perm. app. denied* (Tenn. June 3, 2020).

Rule 404(b) of the Tennessee Rules of Evidence generally prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b); *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). Rule 404(b) allows such evidence in limited circumstances for purposes other than proving action in conformity with a character trait. *Id*. "The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime." *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003) (citing Tenn. R. Evid. 404(b); *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994)). However, the rule sets out certain procedural requirements the trial court must follow before admitting such evidence:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). "Other purposes" has been defined to include: (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation. *State v. Jones*, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985); *Bunch v. State*, 605 S.W.2d 227, 229 (Tenn. 1980). "When the presence or absence of a particular intent which is necessary to constitute the crime charged is a contested issue, and evidence of a prior crime tends to show that intent, it may render the prior crime admissible." *Parton*, 694 S.W.2d at 303 (citing *Mays v. State*, 238 S.W. 1096, 1103 (1921)).

Trial courts are encouraged to take a "restrictive approach [to] [Rule] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). In *Dotson*, our Supreme Court explained the policy in favor of exclusion:

The rationale behind the general rule is that admission of other wrongs carries with it the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge. When the defendant's prior bad acts are similar to the crime for which the defendant is on trial, the risk of unfair prejudice is even higher. As this Court has consistently cautioned, the jury should not "be tempted to convict based upon a defendant's propensity to commit crimes rather than . . . evidence relating to the charged offense."

*Id*. (quoting *State v. Spicer*, 12 S.W.3d 438, 448 (Tenn. 2000)). Provided the trial court substantially complied with the procedure of Rule 404(b), the trial court's decision to admit

or exclude evidence will not be overturned on appeal absent an abuse of discretion. *Jones*, 450 S.W.3d at 891. A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). If the trial court failed to substantially comply with the strict procedural requirements of Rule 404(b), then no deference is given to the trial court's decision to admit or exclude evidence, and this Court will determine admissibility based on the evidence presented at the jury-out hearing. *State v. DuBose*, 953 S.W.2d 649, 653 (Tenn. 1997).

The defendant claims "the trial court abused its discretion when it ruled [the defendant's] prior convictions were necessary to fill the conceptual void of why [the victim] hired [the defendant] in the first place." The defendant asserts that "[t]he only reason to introduce the prior convictions was and is for propensity." We disagree.

The record indicates the trial court substantially complied with the requirements of Rule 404(b) and properly found the evidence was admissible to show the defendant's intent to deceive and steal from the victim. Before the victim testified, the trial court conducted a jury-out hearing on the admissibility of evidence relating to the defendant's two, prior convictions for theft. After considering the evidence and the arguments of the parties, the trial court provided the following reasoning for its admission of the prior crimes evidence:

> Looking at this case, of course the State wishes to introduce evidence of two prior thefts that were not mentioned in the application process, although other people, other prior employers were listed. She neglected to include these two employers on there. And because of that, this victim in this case had no idea that she had been convicted of two prior thefts from other lawyers.
>
> So it appears from the arguments and the evidence that I've heard that her neglecting to add those or to let the victim know in this particular case was part of her plan, was part of her scheme, was part of her intent to deceive.
>
> She created a hole in her background to dupe this victim into hiring her so she could start stealing from him as well. That was part of her plan, part of her intent to steal.
>
> Her concealment of her past is part and parcel in this particular case of her plan to -- and her intent to steal from this particular victim. And because of that, since there are convictions for those two things, there's clear and convincing evidence that had occurred.

- 20 -

Now as to the weighing process, I think it's highly probative of the intent, intent to deceive, intent to steal, intent to conceal her true intentions here. It all goes back to intent. It's extremely probative of her intent to defraud and to steal from this particular victim.

I find it extremely probative and I think that it is necessary for the jury in this particular instance to have that information. And it is not outweighed by the unfair prejudice. I think it would be unfair prejudice to not allow this evidence in. It would not allow the jury to have a complete picture of this intent, this scheme, this plan to steal from this particular victim. So I'm going to allow the evidence to come in.

Accordingly, the record indicates the trial court did not abuse its discretion when it allowed evidence of the defendant's prior theft convictions to be introduced at trial because the defendant's deceit during the hiring process was relevant in order to establish the defendant's intent in committing the crimes. It is clear throughout the record that the defendant garnered the victim's trust in order to gain access and control over his finances. In doing so, the defendant took money from the victim's bank accounts and purchased countless items, including four vehicles, charged his credit cards for her personal expenses, and opened credit cards in the victim's name without his knowledge. Evidence of the defendant's prior theft convictions were relevant and probative to establish the defendant's intent to deceive the victim into trusting her which enabled the defendant to commit her crimes. As noted, "[w]hen the presence or absence of a particular intent which is necessary to constitute the crime charged is a contested issue, and evidence of a prior crime tends to show that intent, it may render the prior crime admissible. *Parton*, 694 S.W.2d at 303.

The record indicates the defendant's intent was a central issue at trial. Therefore, evidence of the defendant's prior theft convictions was relevant and probative to the issue of the defendant's intent to deceive the victim into hiring her in order for her to carry out her crimes, and the probative value of this evidence was not outweighed by the danger of unfair prejudice. The record also indicates the trial court substantially complied with the requirements of Rule 404(b) before permitting the evidence for other purposes. The trial court ruled the testimony regarding the defendant's prior theft convictions was admissible to show her intent to deceive the victim. The trial court also ruled the proof was clear and convincing, and the probative value was not outweighed by the danger of unfair prejudice.

Furthermore, the trial court provided a limiting instruction to the jury, indicating evidence of the defendant's other crimes could only be considered for the purpose of determining whether it provided evidence of "the defendant's intent; that is, such evidence

may be considered by you if it tends to establish that the defendant actually intended to commit the crime with which she is presently charged." We presume the jury followed the trial court's instruction. *State v. Joshua R. Starner*, No. M2014-01690-CCA-R3-CD, 2016 WL 1620778, at *21 (Tenn. Crim. App. Apr. 20, 2016). The defendant is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE